# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

LORNA B. WOIDTKE,
Plaintiff,

vs.

COMMISSIONER OF
SOCIAL SECURITY,
Defendant.

Case No. 1:17-cv-656

Dlott, J.

Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff Lorna B. Woidtke brings this action pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3) for judicial review of the final decision of the Commissioner of Social Security

(Commissioner) denying her application for supplemental security income ("SSI"). This matter

is before the Court on plaintiff's statement of errors (Doc. 12), the Commissioner's response in

opposition (Doc. 17), and plaintiff's reply memorandum (Doc. 20).

## I. Procedural Background

Plaintiff protectively filed her application for SSI in October 2013, alleging disability

since January 1, 2000, due to neuropathy, diabetes, fibromyalgia, mild chronic obstructive

pulmonary disease ("COPD"), arthritis in her hip, and back problems. The application was

denied initially and upon reconsideration. Plaintiff, through a non-attorney representative,

requested and was afforded a hearing before administrative law judge ("ALJ") Thuy-Anh T.

Nguyen on June 7, 2016. Plaintiff and a vocational expert ("VE") appeared and testified at the

ALJ hearing. On August 3, 2016, the ALJ issued a partially favorable decision finding plaintiff

disabled beginning on March 22, 2016, when plaintiff's age category changed to an individual of

advanced age. Plaintiff's request for review by the Appeals Council was denied, making the decision of the ALJ the final administrative decision of the Commissioner.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for SSI, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment – i.e., an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 416.920(a)(4)(i)-(v), 416.920 (b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.*; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers*, 582 F.3d at 652; *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999).

### B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

1. The [plaintiff] has not engaged in substantial gainful activity since filing her application (20 CFR 416.971, *et seq*).

2. At all times relevant to this decision, the [plaintiff] has had the following severe impairments: diabetes mellitus with peripheral neuropathy and retinopathy, degenerative disc disease of the thoracic and lumbar spine, osteoarthritis, chronic obstructive pulmonary disease ("COPD"), obstructive sleep apnea, status-post bilateral cataract surgery, obesity, and affective and anxiety-based disorders (20 CFR 416.920(c)).

3. Since the filing date, the [plaintiff] has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, [the ALJ] finds that since the filing of her application, the [plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except she can never kneel, crouch, crawl, or climb ladders, ropes, or scaffolds and can only occasionally balance, stoop, climb ramps and stairs, or utilize bilateral foot

3

controls. She must avoid concentrated exposure to extreme cold, extreme heat, humidity, wetness, and pulmonary irritants such as fumes, odors, dusts, gases, and poor ventilation, and must avoid even moderate exposure to hazards such as unprotected heights. Moreover, the [plaintiff] is limited to simple, routine tasks in an environment free from strict production quotas and that requires no more than occasional changes, and is limited to occasional and superficial interactions with supervisors, coworkers, and the public. The [plaintiff] will be off-task for 5% of the workday.

5. The [plaintiff] has no past relevant work (20 CFR 416.965).

6. Prior to the established disability onset date, the [plaintiff] was an individual closely approaching advanced age. On March 22, 2016, the [plaintiff]'s age category changed to an individual of advanced age (20 CFR 416.963).

7. The [plaintiff] has a limited education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not an issue in this case because the [plaintiff] does not have past relevant work (20 CFR 416.968).

9. Prior to March 22, 2016, the date the [plaintiff]'s age category changed, considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the [plaintiff] could have performed (20 CFR 416.969 and 416.969a).[1]

10. Beginning on March 22, 2016, the date the [plaintiff]'s age category changed, considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the [plaintiff] could perform (20 CFR 416.960(c) and 416.966).

11. The [plaintiff] was not disabled prior to March 22, 2016, but became disabled on that date and has continued to be disabled through the date of this decision (20 CFR 416.920(g)).

(Tr. 22-35).

---

[1] The ALJ relied on the VE's testimony to find that prior to March 22, 2016, plaintiff would be able to perform the requirements of light occupations such as cleaner/housekeeper (250,000 jobs nationally), assembler of small products (675,000 jobs nationally), and inspector (269,000 jobs nationally). (Tr. 34, 58-59).

4

### C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545–46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D. Medical Evidence

#### i. Good Samaritan Hospital – Faculty Medical Center

Plaintiff treated with internist, Dr. Angel Mena, M.D., from May 2012 through May 2013 for diabetes, back pain, and hypertension. (Tr. 253-302). During her first visit in May 2012, plaintiff explained her complex past medical history, including diabetes mellitus with peripheral neuropathy. (Tr. 278). Plaintiff complained of tinnitus, worsening back pain, and tingling and numbness in both lower extremities. (*Id.*). Her last MRI conducted in 2006 showed disc dissection. (*Id.*). On examination, plaintiff exhibited tenderness, bony tenderness, pain, and spasms in the thoracic and lumbar spinal regions. (Tr. 280). Dr. Mena assessed essential hypertension, tinnitus, lumbago, pain in joints, tobacco use disorder, and obesity. (Tr. 280-81).

In June 2012, plaintiff complained of worsening back pain with numbness and tingling in both lower extremities. (Tr. 282). During the examination, plaintiff exhibited decreased sensation over the lateral aspect of the right thigh, as well as decreased range of motion, tenderness, and spasms in the lumbar region. (Tr. 284). Dr. Mena ordered an updated MRI and a possible referral to neurosurgery depending on the MRI results. (Tr. 284-85). A June 2012 MRI of plaintiff's lumbar spine revealed a small central disc protrusion and an annular tear at L4-L5, which remained unchanged from a prior September 2007 MRI.[2] (Tr. 327-28).

During a July 2012 appointment with Dr. Mena, plaintiff complained of back pain and bilateral hand pain. (Tr. 286). She noted that her back pain was not worse, but it was not much improved. (*Id.*). Plaintiff complained of stiffness in her hand all throughout the day and

---

[2] The MRI from September 2007 is not contained in the Certified Administrative Record.

occasional burning sensations in the palmar surface. (*Id.*). She described her back pain as sharp

and dull in the lumbar area, with radiating pain mostly in her right lower extremity. (*Id.*). Dr.

Mena found swelling in plaintiff's hands, as well as tenderness in the lumbar region. (Tr. 288).

Dr. Mena made referrals to neurosurgery and physical medicine and rehabilitation. (Tr. 289).

Plaintiff had x-rays taken of the thoracic spine in October 2012, which showed "minimal

disc bulge with a tiny, non-compressive disc protrusion at L4-L5 level" and mild compression of

the thecal sac at L5-S1. (Tr. 1392-1393). There was also a compression deformity in the

superior endplate of the T-10 vertebral body that appeared similar to the deformity from a

December 2010 MRI. (Tr. 1392). There was no evidence of acute fracture or malalignment.

(*Id.*). The MRI also revealed evidence of prominent anterior epidural fat at the L5 and S1 levels

causing moderate to severe thecal sac compression and thecal sac distortion, consistent with

epidural lipomatosis. (Tr. 1393).

Plaintiff visited Dr. Mena again in November 2012 and reported that her back pain and

bilateral hand pain had not improved. (Tr. 294). Plaintiff also reported that she started smoking

again due to the stress of losing her health insurance, the upcoming holidays, and a recent motor

vehicle accident. (*Id.*). On examination, plaintiff had decreased range of motion, tenderness,

and pain in the lumbar back, but she exhibited no swelling. (Tr. 297). Dr. Mena assessed

uncontrolled type-II diabetes and lumbago. (*Id.*).

During a March 2013 appointment, plaintiff reported that her chronic back pain was

unchanged. (Tr. 267). Dr. Mena noted that plaintiff had undergone physical therapy, was not a

surgical candidate, and was dependent on narcotics. (*Id.*). Dr. Mena informed plaintiff that he

would no longer provide narcotics because she had violated her narcotic contract by seeing a new primary care physician who prescribed narcotics. (Tr. 270). During a May 2013 visit, plaintiff reported pain in her hands, legs, chest, and back, as well as swelling and stiffness in the mornings. (Tr. 253). On examination, plaintiff was positive for back and joint pain. (Tr. 255). She exhibited tenderness and spasms in her lumbar back and had normal strength and sensation in her right hand. (Tr. 256).

In October 2013, plaintiff visited Dr. Samer Alsamman, M.D., at the Faculty Medical Center and reported uncontrolled neuropathy and worsening bilateral leg pain. (Tr. 527). On examination, Dr. Alsamman found no edema and no tenderness. (Tr. 530). During a November 2013 visit with Dr. Alsamman, plaintiff reported that her diabetes was uncontrolled, but she had not kept a diary of her blood sugar as directed. (Tr. 522). Plaintiff continued to complain of bilateral feet pain. (*Id.*). In December 2013, plaintiff visited Dr. Francis Ogbonna Edeani, M.D., at the Faculty Medical Center and reported uncontrolled feet pain. (Tr. 517). On examination, plaintiff exhibited positive pitting pedal edema and tenderness and an overall normal range of motion. (Tr. 520). Dr. Edeani assessed neuropathy in diabetes, diabetes mellitus, pertussis exposure, lumbago, obesity, and essential benign hypertension. (*Id.*).

### ii. **Forest Hills Family Medicine**

On September 5, 2012, plaintiff began treatment with primary care physician Dr. Risa Spieldoch, M.D., at Forest Hills Family Medicine because it was closer to her home. (Tr. 551). Plaintiff reported that small movements caused severe back spasms and that pain prevented her from getting out of bed. (*Id.*). Dr. Spieldoch assessed chronic pain, type-II diabetes mellitus

8

with neuropathy, hyperlipidemia, hypothyroidism, depression, and vasculopathy. (*Id.*). Dr. Spieldoch prescribed one month of Duragesic and Percocet, and she informed plaintiff that she was not comfortable with prescribing chronic controlled substance medications and that she would need to visit a pain management doctor or return to the University of Cincinnati pain clinic. (Tr. 552).

Plaintiff did not visit Dr. Spieldoch again until February 2014. (Tr. 553). Plaintiff saw Dr. Spieldoch for left shoulder pain, fibromyalgia, and neuropathy. (*Id.*). Plaintiff reported that she lost her medical card and received care at the Good Samaritan Faculty Medical Center. (*Id.*). Plaintiff reported feet burning and stinging and her previous diagnosis of advanced neuropathy. (*Id.*). She also reported left shoulder and back pain. (*Id.*). Dr. Spieldoch again updated plaintiff's medication, discussed tobacco cessation and exercise, and made referrals to pain management and orthopedic surgery. (Tr. 554). During an April 2014 follow-up appointment, plaintiff continued to report burning and stinging in both feet, pain in her shoulders and neck in recent weeks, and chronic lower back pain. (Tr. 1401). On July 21, 2014, plaintiff reported family problems to Dr. Spieldoch and that her right knee had "felt weak, as if it will give out or twist," and that she had this problem "on and off for years." (Tr. 1413). She also started smoking again due to life stressors. (*Id.*). On examination, plaintiff had medial tenderness in the anterior right knee. (*Id.*). Dr. Spieldoch referred plaintiff to Wellington Orthopaedic. (Tr. 1414). In September 2014, plaintiff continued to report knee pain and left and right shoulder pain. (Tr. 1418). Since her last visit with Dr. Spieldoch, plaintiff had visited Wellington Orthopaedic and had received pain medication from Dr. Atluri at Interventional Spine. (*Id.*).

9

On March 26, 2015, plaintiff reported that she had been more active and had lost nineteen pounds. (Tr. 1440). She continued to have pain in her left shoulder and was diagnosed with rotator cuff tendonitis and referred to physical therapy. (*Id.*). Dr. Atluri prescribed a TENS unit for her back pain, which she found "somewhat helpful." (*Id.*). On examination, plaintiff had pain with internal rotation of her left shoulder. (*Id.*). She showed no signs of edema. (*Id.*).

In July 2015, plaintiff brought paperwork for Dr. Spieldoch to complete to assist her in obtaining a power mobility device. (Tr. 1465). Plaintiff complained that her feet felt a burning sensation with increased walking. (*Id.*). She was not using a cane or walker and had no history of falls. She was "able to complete all MRADLs [mobility-related activities of daily living] without assistance." (*Id.*). She did not need or want a wheelchair, but she requested a scooter. (Tr. 1466). Dr. Spieldoch completed the form. (*Id.*). In September 2015, plaintiff continued to report issues with burning and stinging in her back and legs, as well as issues with loss of sensation and neuropathic tingling in the soles of her feet. (Tr. 1478).

### iii. Dr. Tara Chilakamarri

In February 2013, plaintiff began treatment with Dr. Tara Chilakamarri, a physical medicine and rehabilitation specialist at the University of Cincinnati Health Center, for back pain. (Tr. 392). She reported a history of chronic low back pain for about 10-15 years. (Tr. 393). Plaintiff stated that she had a "compound fracture" in her back in April 2009 or 2010, but she never underwent surgery. (*Id.*). She reported that her back spasms "dropped [her] to [her] knees and last 2-3 [minutes] at a time." (*Id.*). She also complained of "needles sticking through [her] arms and feet." (*Id.*). At that time, she rated her pain at 9/10. (*Id.*). She believed that

more activity caused pain, especially playing with her grandkids, bending, standing for more than an hour, and sitting for prolonged periods of time. (*Id.*). She explained to Dr. Chilakamarri that she tried physical therapy, aquatics, and steroid injections, all of which provided no pain relief. (*Id.*). Plaintiff also described burning and tingling in her hands and feet, as well as tenderness throughout her back. (*Id.*). Plaintiff also reported that she enjoyed swimming and was able to swim at a public pool in the summer. (*Id.*). However, she could not drive, walk to the bus stop to use public transportation, or walk three blocks to the library. (*Id.*). Plaintiff stated that she was unable to afford a TENS unit or membership to a community exercise program; however, she had a smart phone, cable TV, and internet in her home. (*Id.*). She also reported that she had been smoking. (Tr. 394). On examination, 16/18 tender points were found, with non-painful bilateral upper extremity range of motion. (Tr. 395). Plaintiff had painful transitional movement, tenderness throughout the back musculature, and increased lumbar lordosis. (*Id.*). No signs of edema were found in her extremities. (*Id.*). Dr. Chilakamarri assessed chronic lower back pain, peripheral neuropathy, and symptoms consistent with fibromyalgia. (*Id.*).

In June 2013, plaintiff continued to complain of back spasms, and pins and needles sensations in her arms and legs. (Tr. 410). Plaintiff explained that her pain was located primarily in her hips when walking and also radiated into her shoulders. (*Id.*). She rated her pain at 8/10. (*Id.*). Dr. Chilakamarri noted: "[W]hen I offered to give patient prescriptions for medication changes as noted above she said she would just call her [primary care physician's] office at [Good Samaritan] for new prescriptions. She seemed disinterested in the options I

11

offered above. Would be happy to continue to help but I have clearly indicated that I will not supply any narcotics." (Tr. 414).

### iv. **Interventional Spine Specialists**

On July 8, 2014, plaintiff had a consultation with pain management physician Dr. Sairam Atluri, M.D., for low back pain, neck pain, peripheral neuropathy, and left shoulder pain. (Tr. 1390-91). Plaintiff reported that her back pain went to her thighs and down her legs, but it improved with standing. (Tr. 1390). She stated that "the pain started many years ago when she was injured." (*Id.*). Plaintiff also complained of numbness in her legs, as well as left shoulder pain and bilateral foot pain from peripheral neuropathy. (Tr. 1390). On examination, Dr. Atluri noted that "[m]ild touch caused significant tenderness in the spinous processes, paraspinal muscles, facets and [sacroiliac] joints." Plaintiff exhibited normal motor strength in the lower extremities, sensation, flexion, and gait. (Tr. 1391). Plaintiff did not appear to be depressed, anxious, agitated, in severe pain, or intoxicated. (*Id.*). Dr. Atluri prescribed low doses of opioids and noted that plaintiff needed careful monitoring. (*Id.*). Dr. Atluri also noted that plaintiff had "failed physical therapy" and was "not interested in interventional therapies, surgical options, or chiropractic care." (*Id.*). Dr. Atluri advised plaintiff to maintain normal activities and to avoid bed rest. (*Id.*). Dr. Atluri also recommended monitoring plaintiff's low doses of opioids. (*Id.*).

In January 2015, plaintiff visited Nurse Practitioner Catherine Ellis at Interventional Spine Specialists and complained of "sharp and shooting" and "constant" neck and low back pain. (Tr. 1383). On examination, plaintiff had tenderness in multiple areas of the musculoskeletal region, but her gait, motor strength, sensation, and flexion were normal. (Tr.

12

1384). Ms. Ellis assessed lumbar disc displacement and neuropathy. (*Id.*). Plaintiff continued to receive treatment at Interventional Spine Specialists through February 2016, where specialists continued to monitor her opioid medication treatment. (Tr. 1347-76).

### v. **Wellington Orthopedic**

On July 31, 2014, plaintiff had a consultation with orthopedic physician, Dr. Arthur F. Lee, M.D., for left shoulder and right knee pain. (Tr. 709). Dr. Lee noted that plaintiff had: "numerous comorbidities including uncontrolled diabetes and chronic pain for which she sees a pain specialist. She has been having ongoing right knee and left shoulder pain now for several years. She reports minimal relief with pain medications. She has a family history of rheumatoid arthritis." (*Id.*). Plaintiff reported she has right knee pain primarily along the medial aspect that increases with weightbearing. (*Id.*). On examination, Dr. Lee noted plaintiff was "morbidly obese and DECONDITIONED." (Tr. 710). An examination of plaintiff's left shoulder revealed "no visible deformity. Her range of motion is excellent 0-100° of forward flexion and abduction with pain. She has pain with resisted supraspinous and infraspinous testing today. Mild discomfort with Hawkins testing as well. She can feel touch along the left upper extremity and her radial pulses palpable 2+." (Tr. 711). X-rays of plaintiff's right knee revealed tri-compartmental degenerative changes. (*Id.*). X-rays of plaintiff's shoulder revealed mild spurring but no acute findings such as fracture or dislocation. (*Id.*). Dr. Lee assessed left shoulder adhesive capsulitis versus rotator cuff tendinitis and right knee tricompartmental degenerative change. (*Id.*). Dr. Lee indicated that plaintiff was not a good candidate for

13

cortisone injections because of her uncontrolled diabetes. (Tr. 712). He referred plaintiff to physical therapy and prescribed a walking boot. (*Id.*).

On November 12, 2014, plaintiff had a follow-up visit with Ashley Nicole Howard, P.A., for the pain in her knee and shoulder. (Tr. 707). On examination, plaintiff had tenderness to palpation and a normal range of motion in the knee and shoulder, both of which were mildly limited in flexion and internal rotation. (Tr. 708). On September 22, 2015, plaintiff visited podiatrist Gordon Yun, D.P.M., at Wellington Orthopedic. (Tr. 706). She complained of pain in the top of her left foot for approximately six weeks. (*Id.*). On examination, Dr. Yun found tenderness and very mild edema. (*Id.*). X-rays revealed no acute fractures or dislocations. (*Id.*). Dr. Yun assessed midfoot synovitis and tenosynovitis of the left foot and prescribed a walking boot. (*Id.*).

### vi. **Mercy Hospital, Anderson, Ohio**

Plaintiff visited the emergency room on February 26, 2014, complaining of chest pain and a headache. On examination, plaintiff had full strength, a normal gait, and no edema. (Tr. 568-80). She underwent a cardiac catheterization that revealed occlusion of her mid-left circumflex artery and required the placement of a stent. (Tr. 572-74). ECG testing and x-rays indicated the presence of vascular disease and moderate concentric left ventricular hypertrophy, with a normal ejection fraction between 55-60%. (Tr. 733).

On July 28, 2014, plaintiff visited the emergency room again complaining of a nonproductive cough with labored breathing on exertion. (Tr. 1184). On examination, plaintiff exhibited unlabored respirations, and trace rales at the bases with an otherwise good air

exchange. (Tr. 1187-88). Plaintiff also had no peripheral edema. (Tr. 1188). A chest x-ray suggested mild pulmonary edema. (Tr. 1193). An echocardiogram was normal. (Tr. 1189). Plaintiff was given Lasix and discharged with a diagnosis of congestive heart failure. (*Id.*).

On December 27, 2014, plaintiff visited the emergency room for abdominal and back pain. (Tr. 1114). Plaintiff displayed no edema, and she had normal neurological findings and a normal gait. (Tr. 1118). A CT scan revealed no "acute pathology."

In June 2015, plaintiff was admitted to the hospital with complaints of chest pain. She underwent another cardiac catheterization that showed vasospasm of coronaries, and a reversible ischemic in the anteroseptal wall. (Tr. 964-81).

### vii. Mateen Hotiana, M.D. - endocrinologist

Plaintiff treated with Dr. Mateen Hotiana, M.D., from December 2015 through March 2016 for her diabetes. (Tr. 1527-73). Dr. Hotiana's clinical notes report that plaintiff exhibited decreased vibratory sensations in her feet as a result of diabetic peripheral neuropathy. (Tr. 1546, 1533-35, 1562, 1569).

### viii. Consultative examining physician

On July 9, 2014, Dr. Martin Fritzhand, M.D., conducted a consultative examination at the request of the state agency. (Tr. 659-67). Plaintiff reported that she suffered from low back pain and numbness in her right hip. (Tr. 659). She also reported exacerbation of her pain with standing or weight bearing, bending, stooping, and lifting. (*Id.*). She also complained of shortness of breath. (*Id.*). On examination, Dr. Fritzhand noted that plaintiff was "massively obese" at 5 ft. tall weighing 233 lbs., she walked with a normal gait, and "was comfortable in the

sitting and supine positions." (Tr. 660). However, her straight leg raising and range of motion in her hip with knees flexed were "diminished." She could squat without difficulty and bend forward to 85 degrees and stand on either leg. (Tr. 660-61). Forward bending, flexion, and extension of the spine were normal. (*Id.*). She had no pedal edema, and there was "no evidence of muscle weakness or atrophy." (Tr. 661). Dr. Fritzhand concluded that assuming pulmonary function studies would not reveal additional limitations, plaintiff appeared "capable of performing a mild to possibly some moderate amount of sitting, ambulating, standing, bending, pushing, pulling, lifting and carrying heavy objects." (Tr. 662). Dr. Fritzhand assessed morbid obesity, chronic low back pain, chronic pain in the right hip, type II diabetes mellitus, arteriosclerotic heart disease, gastroesophageal reflux disease, peripheral vascular disease, and stenting of the left subclavian artery. (Tr. 661).

### ix. State agency physicians

Frank Stroebel, M.D., reviewed the file in December 2013, and found that plaintiff could stand, walk, and sit for approximately 6 hours of an 8-hour workday; occasionally lift and/or carry twenty pounds; frequently balance; occasionally climb ramps and stairs, stoop, kneel, crouch and crawl; and never climb ladders, ropes, and scaffolds. (Tr. 76). Plaintiff was also limited to occasionally use of bilateral foot controls. (*Id.*). According to Dr. Stroebel, plaintiff should also avoid concentrated exposure of extreme hot and cold and avoid all exposure to hazards, such as machinery and heights. Dr. Leanne Bertani, M.D., reviewed plaintiff's file upon reconsideration in July 2014, and largely affirmed the assessment of Dr. Stroebel. (Tr. 96-99).

16

### E. Specific Error

Plaintiff alleges a single assignment of error: that the ALJ's RFC for light work is not supported by substantial evidence. (Doc. 12).

### 1. The Parties' Arguments

Plaintiff argues that the ALJ's RFC for light work is not supported because the ALJ ignored medical evidence in support of lesser restrictions that would limit her to at least sedentary work, which would make her automatically disabled under Grid Rule 201.09. (Doc. 12 at 8). Plaintiff states that several medical findings present in the record would clearly prevent her from performing even a reduced range of light work and would limit her to at least sedentary work from as early as her 50th birthday. (*Id.* at 10). Specifically, plaintiff states that she has struggled with neuropathy in her lower extremities, as well as hip and lower back issues, since 2012. (*Id.* at 8). Plaintiff cites to treatment notes from Dr. Mena and the MRI of her lower back from 2012 as documenting these conditions. (*Id.* at 8-9) (citing Tr. 278, 282, 327-329). Plaintiff alleges Dr. Chilakamarri documented that her back pain worsened in 2013, and she had an onset of pain in her hands and legs. (*Id.* at 9) (citing Tr. 253, 393, 527). Plaintiff also cites to treatment notes and x-rays from Wellington Orthopedic and Forest Hills Family Medicine documenting issues with her left shoulder, right knee, burning and stinging pain in her back and legs, and loss of sensation and neuropathic tingling in the soles of her feet. (*Id.* at 9-10) (citing Tr. 706, 711, 1401, 1478). Plaintiff also argues that the ALJ erred in describing Dr. Fritzhand's consultation as "at least somewhat consistent with the record" because he opined that plaintiff could only perform a mild to moderate amount of sitting, standing, and ambulating, which is not

consistent with the ALJ's determination that plaintiff could perform the jobs of cleaner, assembler, and inspector. (*Id.* at 9). Plaintiff further argues that in affording Dr. Alturi's opinion significant weight, the ALJ ignored lesser restrictions found in Dr. Alturi's progress notes. (*Id.*).

In response, the Commissioner argues that the ALJ sufficiently articulated her RFC analysis in accordance with Social Security Ruling 96-8p and provided a narrative discussion of the record evidence and an explanation as to how the evidence supported her RFC finding. (Doc. 17 at 9). The Commissioner maintains that the ALJ discussed the records that plaintiff alleges were ignored and cited to ample evidence in the record supporting the RFC. (*Id.* at 10). The Commissioner contends that plaintiff fails to show how any of the allegedly ignored records could only have been consistent with sedentary work and not light work. (*Id.*). The Commissioner argues that the ALJ was not required to accept plaintiff's subjective complaints that her leg and back pain worsened in 2013. (*Id.* at 11). The Commissioner further argues that plaintiff has not shown how Dr. Atluri's notes were inconsistent with the ALJ's RFC finding that plaintiff could perform a reduced range of light work. (*Id.* at 13).

In her reply brief, plaintiff cites to additional evidence that purportedly supports a restriction to sedentary work. (Doc. 20 at 3) (citing Tr. 708—diagnosis of right knee patellofemoral syndrome; Tr. 711—Dr. Lee indicated significant degeneration of the knee; Tr. 395, 411—objective evidence supporting her complaints of fibromyalgia pain, including 16 of 18 tender points and clinical findings indicating painful transitional movement, tenderness throughout the back musculature, increased lumbar lordosis, and hip tenderness; Tr. 661—Dr. Fritzhand's finding of diminished straight leg raises bilaterally, diminished range of motion of

the hips, chronic low back pain, and chronic hip pain; Tr. 706—Dr. Yun's opinion that plaintiff's

"overall activity is to be decreased as a result of her chronic foot pain;" Tr. 1355—Dr. Atluri's

objective findings of decreased motor strength; Tr. 1534, 1546, 1569—Dr. Hotiana indicated

decreased vibratory sensations in both feet on exam).

The Social Security regulations vest the ALJ with the responsibility of assessing an

individual's RFC. 20 C.F.R. § 416.946(c); 20 C.F.R. § 416.927(d)(2) (the final responsibility for

deciding an individual's RFC is reserved to the Commissioner). "Physicians render opinions on

a claimant's RFC, but the ultimate responsibility for determining a claimant's capacity to work

lies with the Commissioner." *Profitt v. Comm'r. of Soc. Sec.*, No. 1:13-cv-679, 2014 WL

7660138, at *6 (S.D. Ohio Dec. 12, 2014) (Report and Recommendation), *adopted*, 2015 WL

248052 (S.D. Ohio Jan. 20, 2015) (citations omitted). The ALJ is responsible for assessing a

claimant's RFC based on all of the relevant medical and other evidence. 20 C.F.R. § 416.920b.

*See also Moore v. Astrue*, No. CIV.A. 07-204, 2008 WL 2051019, at *5-6 (E.D. Ky. May 12,

2008) (the ALJ is responsible for assessing the claimant's RFC by examining all the evidence in

the record) (citing *Bingaman v. Comm'r of Soc. Sec.*, 186 F. App'x 642, 647 (6th Cir. 2006)).

The ALJ can fulfill her obligation "without directly addressing in [her] written decision every

piece of evidence submitted by a party." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496,

508 (6th Cir. 2006) (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th

Cir. 1999) (citations and internal quotation marks omitted)).

The ALJ's RFC determination is supported by substantial evidence. The ALJ conducted

a thorough review of the medical evidence to find that plaintiff had the RFC to perform light

work with certain limitations. First, the ALJ thoroughly considered plaintiff's neuropathy and

her complaints of tingling and numbness in her lower extremities and found that the objective

examination findings did not support these complaints. Specifically, the ALJ stated:

> Treating sources described the [plaintiff's] neuropathic symptoms as "severe" by the end of 2013, with records advising her of ongoing use of prescribed Gabapentin in an effort to relieve numbness, tingling, and weakness in her hands and feet (see Exhibits B4F/38 and B7F/4). Her allegations of uncontrollable foot pain and abnormal monofilament testing led to increases in her dosage at that time; however, physical testing also noted her intact range of extremity motion (see Exhibit B7F/7). The [plaintiff] sporadically alleged pain in her feet as well as tingling sensations and weakness in her extremities throughout the remainder of the record, but physical testing only occasionally suggested reductions in left leg strength and decreased vibratory sensation in her feet (see Exhibits B17F and B19F/8). Most often, such objective testing advised of her retention of full sensation, normal levels of coordination, intact grip strength, and unimpaired manipulative abilities, findings that fail to corroborate the [plaintiff]'s contentions of debilitating neuropathic complications (see Exhibits B10F/4, B16F/121, B17F, and B18F/3).

(Tr. 28). The evidence to which plaintiff cites in support of her symptoms of tingling and

numbness in her lower extremities (Tr. 278, 282) represent her subjective complaints of

neuropathy, which the ALJ is not required to accept absent supporting objective medical

evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) ("[t]here is no

question that subjective complaints of a claimant can support a claim for disability, if there is

also objective medical evidence of an underlying medical condition in the record."). Likewise,

the ALJ reasonably considered that findings of reduced left leg strength and decreased vibratory

sensations were only occasional and failed to support plaintiff's allegations of disabling leg and

foot impairments throughout the relevant time period.

Second, the ALJ thoroughly considered the MRIs of plaintiff's lower back pain in

assessing plaintiff's RFC. The ALJ noted that plaintiff's complaints of chronic spinal pain failed

to comport with the diagnostic or other objective testing evidence of record. (Tr. 28).

Specifically, the ALJ stated:

> MRI and x-ray studies obtained in June and October 2012 revealed nothing more than a "most likely old" compression deformity involving her T10 vertebral body superior endplate and lumbar disc desiccation producing a single-level "small" protrusion with annular tearing at L4-L5 (see Exhibits B3F/10-11 and B17F/47). These images expressly noted the absence of evidence demonstrating acute fracture or malalignment, while objective testing conducted in July 2014 returned "no evidence of nerve root damage" (see Exhibits B10F/4 and B17F/47). While additional imaging studies conducted in late 2014 returned incidental suggestions of a partially sacralized L5, no further follow-up images were ever obtained (see Exhibit B16F/278).

(Tr. 29). Plaintiff has failed to show how the ALJ erred in considering the MRI results of her lower back or how the results of the MRI suggest an RFC for sedentary work only.

Third, the ALJ considered the worsening of plaintiff's pain in her back, hands, and legs in 2013. As noted above, the ALJ considered that treating source progress notes described plaintiff's neuropathic symptoms as "severe" by the end of 2013. (Tr. 28). However, the ALJ reasonably noted that objective testing failed to corroborate these complaints. (*Id.*). Plaintiff has not shown how the ALJ erred in this regard.

Plaintiff has also not shown how the ALJ erred in considering the consultative examination of Dr. Fritzhand. The ALJ afforded the opinion of Dr. Fritzhand "little weight" and adopted his opinion insofar as it was "at least somewhat consistent" with a reduced range of light work activity because Dr. Fritzhand found that plaintiff was capable of performing a "mild to possibly moderate amount" of exertional and other activity. (Tr. 32). Plaintiff argues that this portion of Dr. Fritzhand's assessment is inconsistent with the jobs of cleaner, assembler, and inspector; however, she has failed to direct the Court's attention to any authority suggesting that

these jobs require more than a mild to moderate amount of sitting, standing, or ambulating.

Plaintiff also cites to Dr. Fritzhand's findings of diminished straight leg raising and range of

motion of the hips as supporting her subjective complaints of her limited ability to stand.

However, as the ALJ noted, Dr. Fritzhand's exam also revealed findings inconsistent with

plaintiff's alleged limitations, including that plaintiff ambulated with a normal gait, displayed no

weakness or atrophy, and was able to forward bend, squat, and stand on either leg. (Tr. 29).

The ALJ also thoroughly considered the progress notes and opinion from Dr. Atluri,

despite plaintiff's argument to the contrary. The ALJ considered Dr. Atluri's statement from

July 2014 (Tr. 1390-91) and noted that he recommended that she avoid bed rest and maintain

normal activities as much as possible. (Tr. 32). The ALJ noted that Dr. Atluri's

recommendations accounted for plaintiff's various diagnoses of back, neck, and shoulder pain,

and the effects of her neuropathic symptomology. (*Id.*). As stated above, the ALJ thoroughly

evaluated plaintiff's complaints of back and leg pain, numbness in the legs, and bilateral foot

pain, which included a review of records and progress notes from Dr. Atluri. The ALJ noted

that treating sources described plaintiff's neuropathic symptoms as "severe" and plaintiff

complained of pain in her feet, as well as tingling sensations and weaknesses in her extremities,

but objective testing revealed that she maintained full sensation, normal levels of coordination,

intact grip strength, and unimpaired manipulative abilities, which did not corroborate her

subjective complaints throughout the relevant time period. (Tr. 28) (citing B17F, records from

Dr. Atluri).

Additionally, the ALJ considered that plaintiff occasionally displayed findings that objectively supported her subjective complaints, such as those related to fibromyalgia in February and June 2013 and Dr. Atluri's finding of decreased motor strength. (Doc. 20 at 3) (citing Tr. 395, 411, 1355). Nevertheless, the ALJ reasonably determined that consistent clinical findings of a normal gait and full levels of strength, sensation, and range of motion as recently as February 2016 undermined plaintiff's allegations of significant functional limitations. (Tr. 29).

Finally, plaintiff contends the ALJ dismissed her subjective complaints out of hand and failed to consider them in relation to the objective evidence of record, including Dr. Lee's July 2014 finding of significant degeneration of the knee. (Doc. 20 at 3) (citing Tr. 712). Contrary to plaintiff's argument, the ALJ considered the x-rays of plaintiff's left shoulder and right knee and provided a lengthy analysis as to why these conditions were not as disabling as alleged. Images of plaintiff's knee and shoulder obtained in July 2014 suggested tri-compartmental degenerative changes in the knee and mild spurring in the shoulder. (Tr. 29) (citing Tr. 710-11). The ALJ explained that the x-ray findings "failed to objectively establish the presence of disabling functional limitations." (Tr. 29). The ALJ further noted that on physical examination of the knee in July 2014, there was "slight" effusion, medial joint line tenderness, and a slightly antalgic gait. (*Id.*) (citing Tr. 710). By November 2014, physical examination revealed tenderness in the knee, but normal strength, normal gait, and full range of motion. (*Id.*) (citing Tr. 708). That same month, physical testing of plaintiff's shoulder indicated the presence of tenderness; however, plaintiff continued to display normal levels of strength and sensation and no more than slight limitations in her range of motion. (*Id.*) (citing Tr. 708). The ALJ's analysis

23

does not reflect she dismissed plaintiff's subjective complaints without an assessment of the objective and clinical evidence.

Contrary to plaintiff's assertions, the ALJ reviewed all of the relevant medical evidence in assessing her RFC.  The ALJ bears the task of weighing the evidence and resolving inconsistencies in the record.  For this reason, the Sixth Circuit has stressed that even where substantial evidence would support a different conclusion or where a reviewing court would have decided the matter differently, the ALJ's decision must be affirmed if it is supported by substantial evidence.  *See Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999).  Because the ALJ's decision finds substantial support in the record, plaintiff's assignment of error should be overruled.

**IT IS THEREFORE RECOMMENDED** that the decision of the Commissioner be **AFFIRMED** and this case be closed on the docket of the Court.

Date: __11/19/18__

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

LORNA B. WOIDTKE,  
      Plaintiff,

vs.

COMMISSIONER OF  
SOCIAL SECURITY,  
      Defendant.

Case No. 1:17-cv-656  
Dlott, J.  
Litkovitz, M.J.

**NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn*, 474 U.S. 140 (1985); *United States* v. *Walters*, 638 F.2d 947 (6th Cir. 1981).